138 P.3d 299 (2006)
B.H., Petitioner
v.
The PEOPLE of the State of Colorado, In the Interest of X.H., a child, Respondent.
No. 05SC686.
Supreme Court of Colorado, En Banc.
June 26, 2006.
Davide C. Migliaccio, Colorado Springs, Colorado, Attorney for Petitioner.
William Louis, El Paso County Attorney, Laura C. Rhyne, Deputy County Attorney, Colorado Springs, Colorado, Attorneys for Respondent.
*300 Jill E. Tompkins, Boulder, Colorado, Attorney for Amicus Curiae American Indian Law Clinic, Colorado Indian Bar Association, and American Indian Law Center.
John W. Suthers, Attorney General, Mark N. McMullen, Assistant Attorney General, Denver, Colorado, Attorneys for Amicus Curiae Attorney General of the State of Colorado.
Justice COATS delivered the Opinion of the Court.
B.H., the natural mother of X.H., sought review of the court of appeals unpublished opinion affirming the district court's order terminating the parent-child relationship. The district court proceeded to trial and granted the state's motion to terminate parental rights, despite notice never having been given to any Indian tribe or the Bureau of Indian Affairs that X.H. might be an Indian child within the meaning of the federal Indian Child Welfare Act. The court of appeals affirmed, holding that the applicability of the Act had not been established.
Because the El Paso County Department of Human Services and the district court had reason to believe that a federally recognized Indian tribe could consider X.H. to be a tribal member or the eligible biological child of a member, potentially affected tribes were entitled to notice of the proceedings prior to any determination by the court. The judgment of the court of appeals is therefore reversed and the case is remanded with instructions to order that notice be given in accordance with the provisions of the Indian Child Welfare Act and the Colorado Children's Code. If it is ultimately determined, after proper notice, that X.H. is not an Indian child, the district court's order terminating parental rights shall stand affirmed. If X.H. is determined to be an Indian child, the district court must proceed in accordance with the Act.

I.
In June 2004, the El Paso County Department of Human Services filed a petition in the juvenile division of the district court, alleging that X.H. was a dependent and neglected child. As a result of her mother's methamphetamine use and related criminal activity, X.H. had been placed in foster care earlier that month. In July, following the department's "diligent search" for family members, including the child's mother and father, it filed a report with the court, characterizing the child's mother, B.H., as "Native American/White" and the child's maternal grandmother as "Native American." The grandmother had reported that her great-great grandmother had walked the Trail of Tears; that she was trying to register with the Cherokee tribe at that very time; and that she had officially adopted her Indian name. Neither the department nor the court made further inquiry into X.H.'s Indian heritage or attempted to verify her status as an Indian child.
On January 24, 2005, the department filed a motion to terminate the parent-child legal relationship. When the parties appeared for the termination hearing on April 20, 2005, however, the department immediately requested a continuance, recommending more time for the mother to comply with her treatment plan and placement of the child with her grandmother. Only the guardian ad litem objected, arguing that any progress by the mother was inadequate. Focusing on the child's residence in the same foster placement for over ten months, the court found the state's plan hopeful but insufficient.
On the following day, just before the termination hearing was to begin, the department brought the possible applicability of the Indian Child Welfare Act[1] to the court's attention, informing the court that the child's grandmother had mentioned her Native American ancestry in a meeting the day before. In response to the guardian's expressed concerns about dilatory tactics and the court's query about an earlier alleged disclaimer by the child's mother, the mother's attorney represented that she disputed ever having been asked about her Native American roots. The attorney further represented that the child's grandmother had disclosed to the department, as early as August *301 or September 2004, the fact that her own grandmother had received tribal scholarships. The court acknowledged that the child's Indian heritage had clearly been reported in the search documents, and it reprimanded the department for failing to investigate further during the ensuing ten months. Nevertheless, rather than postpone the termination hearing until notice could be given according to the Act, which the court felt would interfere with permanency for the child, it took testimony to resolve for itself the applicability of the Act.
The court heard directly from both the department of human services caseworker and the child's grandmother. The caseworker acknowledged that she had never personally discussed the Indian Child Welfare Act with the child's mother and that she was not familiar with tribal enrollment requirements. She also testified, however, that the child's grandmother had expressed concern about X.H. being disconnected from her Native American cultural traditions. The grandmother herself testified that she was of Cherokee descent; that she had been actively researching her heritage for more than a year; and that she was in direct contact with the "Cherokee Nation through Alabama." When questioned about a previous concession that X.H. should remain with the foster family, the grandmother explained that she had since come to realize how difficult it would be for her to maintain the contact with her granddaughter anticipated under the promised arrangement. While she conceded that she had never before brought the issue of her grandchild's Indian status to the court's attention, she maintained that she had raised it numerous times with the department.
Concluding that the Act did not apply, the court articulated several reasons for its decision. The court found as a matter of fact that the mother had initially denied the applicability of the Act, and even though she may have been under the influence of methamphetamine at the time, the long pendency of the case had given her an opportunity to correct that statement if she wished. The court also considered it suspicious that the child's grandmother had not raised the applicability of the Act before the court until a continuance was denied. The court was openly skeptical that the grandmother expressed concern for protecting X.H.'s Indian heritage only after contact with her became an issue. Finally, although the court indicated that evidence of the child's eligibility for membership in a federally recognized tribe was insufficiently convincing either way, it concluded that neither the child nor her mother was currently a tribal member, and the expectation of a response to the grandmother's inquiries from the Cherokee tribe was insufficient to trigger ICWA applicability.
The hearing proceeded on the issue of termination. In light of the mother's 15-year methamphetamine habit, her admitted neglect and abuse of her children, and her incarceration, the court terminated her parental rights. Largely to avoid further disruption in X.H.'s life, the court chose not to place her with her grandmother.
The mother appealed, assigning error to the court's failure to comply with the tribal notice requirements of the federal Indian Child Welfare Act and the Colorado Children's Code. Acknowledging that "it may have been better practice to follow the notice procedures . . . upon learning that there was some contention of Indian ancestry," the court of appeals nevertheless affirmed. The appellate court held that while the tribe's determination of its membership would be conclusive, the trial court must ascertain whether the child is Indian in the absence of such a determination. As it was undisputed that neither X.H. nor her mother was a "registered" member of an Indian tribe, the court of appeals concluded that ICWA applicability had not been proven.

II.
In 1978, Congress enacted the Indian Child Welfare Act, 92 Stat. 3069, 25 U.S.C. §§ 1901-1963, out of a mounting concern over child welfare practices resulting in the involuntary separation of alarming numbers of Indian children from their families for placement in non-Indian homes or institutions. Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Congress found that *302 "the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." 25 U.S.C. § 1901(3). In the Act, it therefore established minimum standards for the removal of Indian children from their families. 25 U.S.C. § 1902.
The clear policy choice of the Act is to place Indian children within the Indian community whenever possible. Holyfield, 490 U.S. at 37, 109 S.Ct. 1597. In furtherance of that goal, the Act vests jurisdiction over custody matters, under certain circumstances, in the tribal courts, while prescribing procedural and substantive standards, including a right of intervention by Indian tribes in proceedings that remain in the state courts. E.g., 25 U.S.C. §§ 1911, 1912; see Holyfield, 490 U.S. at 36-37, 109 S.Ct. 1597. The Colorado General Assembly has expressly provided for compliance with, and consistent application of, the federal Act in the Colorado Children's Code. See § 19-1-126, C.R.S. (2005).
In the past, the United States Supreme Court has emphasized the unique relationship that exists between the federal government and Indian tribes. See Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). The United States Constitution vests the federal government with exclusive authority over Indian affairs, U.S. Const. art. 1, § 8, cl. 3, based upon the historical trust relationship between the United States and Indian tribes. Blackfeet Tribe, 471 U.S. at 764, 766, 105 S.Ct. 2399. As a result of this unique trust relationship, even standard principles of statutory construction do not have their usual force in matters involving Indian law. Id. at 766, 105 S.Ct. 2399. Rather, the Supreme Court has held that statutes enacted for the benefit of Indians, as well as regulations, guidelines, and state statutes promulgated for their implementation, must be liberally construed in favor of Indian interests. Id.; see Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67585-86 (Nov. 29, 1979).[2]
The ICWA pertains to various child custody proceedings involving Indian children, including the termination of parental rights. See 25 U.S.C. §§ 1903(1) and (4), 1911, 1912. A state is required by the Act to provide notice to the child's or its parent's tribe, or the Bureau of Indian Affairs if the tribe cannot be identified or located, whenever the court knows or has reason to know that an Indian child is involved. 25 U.S.C. § 1912(a).[3] By Colorado's implementing legislation, in every termination of parental rights proceeding, the petitioning party has an affirmative duty to make continuing inquiries to determine whether the subject child is an Indian child and to identify any particular tribal affiliation, § 19-1-126(1)(a), and to give notice in the manner prescribed by statute[4] whenever the petitioning or filing party knows or has reason to believe that the child who is the subject of the proceeding is an Indian child, § 19-1-126(1)(b). Under the "reason to know" or "reason to believe" standards, the state's obligation to notify potentially concerned tribes or the BIA necessarily arises preliminary to an ultimate determination of the child's Indian status. See In re Guardianship of J.O., 327 N.J.Super. 304, 743 A.2d 341, 346-47 (App.Div.2000) (citing *303 numerous state court opinions reaching this conclusion with regard to the federal Act).
The Act defines an "Indian child" as any unmarried person under the age of eighteen, who is either a member of an Indian tribe or eligible for membership and the biological child of a member. 25 U.S.C. § 1903(4).[5] Tribal membership, however, is not defined by the Act. Membership for purposes of the Act is instead left to the control of each individual tribe. Guidelines, 44 Fed. Reg. at 67586; Cohen's Handbook of Federal Indian Law § 3.03[3] (Nell Jessup Newton, et al. eds., 2005) ("[O]ne of an Indian tribe's most basic powers is the authority to determine questions of its own membership."). Depending upon an individual tribe's criteria for membership, or its process for acquiring or establishing membership, which may or may not include some form of formal enrollment or registration, the ability of a court to ascertain membership in a particular tribe without a tribal determination may vary greatly. See United States v. Broncheau, 597 F.2d 1260, 1263 (9th Cir.1979); In re Baby Boy Doe, 123 Idaho 464, 849 P.2d 925, 931 (1993); In re Termination of Parental Rights to Arianna R.G., 259 Wis.2d 563, 657 N.W.2d 363, 369 (2003) (while many tribes require registration or enrollment as a condition of membership, some automatically include descendents of members); Guidelines, 44 Fed.Reg. at 67586 (some tribes do not keep written rolls and others have rolls that only list members as of a certain date).
Not only are the tribes themselves therefore the best source of information concerning tribal membership, see Guidelines, 44 Fed.Reg. at 67586, but the Act also recognizes that Indian tribes have a separate interest in Indian children, distinct from, but equivalent to, parental interests, Holyfield, 490 U.S. at 52, 109 S.Ct. 1597. Consequently, tribes must have a meaningful opportunity to participate in determining whether the child is Indian, e.g., Arianna R.G., 657 N.W.2d at 368, and to be heard on the issue of ICWA applicability, e.g., In re H.D., 11 Kan.App.2d 531, 729 P.2d 1234, 1239 (1986). An Indian tribe, like an Indian parent from whom custody was removed, is therefore permitted by the Act to petition any court of competent jurisdiction to invalidate an order terminating parental rights upon a showing that notice was not provided as required by the Act. See 25 U.S.C. § 1914.
Precisely what constitutes "reason to know" or "reason to believe" in any particular set of circumstances will necessarily evade meaningful description. As in other contexts, reasonable grounds to believe must depend upon the totality of the circumstances and include consideration of not only the nature and specificity of available information but also the credibility of the source of that information and the basis of the source's knowledge. In light of the purpose of the Act, however, to permit tribal involvement in child-custody determinations whenever tribal members are involved, the threshold requirement for notice was clearly not intended to be high.
The Guidelines set forth some examples of circumstances creating "reason to believe," which include:
(i) Any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child.
(ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.
. . .
(v) An officer of the court involved in the proceeding has knowledge that the child may be an Indian child.
44 Fed.Reg. at 67586. Consistent with the above circumstances, state courts have given the notice obligation a "broad reading," redressing notice violations when the child's Indian status is unclear. In re M.P.C., 153 Vt. 275, 571 A.2d 627, 633-34 (1989).
A number of courts have directly held that the mere assertion of Indian descent is enough to trigger notice to the tribe. E.g., *304 In re Jeffrey A., 103 Cal.App.4th 1103, 1107-08, 127 Cal.Rptr.2d 314 (2002) (notice required when state child protection agency discovers that the child "may have Indian ancestry"); In re Dependency of T.L.G., 126 Wash.App. 181, 108 P.3d 156, 158 (2005) (notice required when child "possibly" an Indian child).
Many other courts have supported this idea by implication, requiring evidence of proper notice in similar circumstances. H.D., 729 P.2d 1234 (mother informed social worker and court that she was of Indian descent); In re Brooke C., 127 Cal.App.4th 377, 25 Cal.Rptr.3d 590, 594 (2005) (parents advised social worker of possible Indian heritage); In re Jennifer A., 103 Cal.App.4th 692, 699, 127 Cal.Rptr.2d 54 (2002) (report to court contained parents' claim of Indian heritage); M.C.P., 571 A.2d at 632 (trial court informed on numerous occasions that both the child and her adoptive parents were of Indian origin); In re J.W., 498 N.W.2d 417, 419 (Iowa Ct.App.1993) (undisputed that mother had Native American blood, and she was a member of one tribe and eligible for membership in another); People in re C.H., 510 N.W.2d 119, 123 (S.D.1993) (mother claimed that she was half-Indian). In contrast, an out-of-context allusion to an Indian tribe may be deemed insufficient to require notice. See In the Matter of Johanson, 156 Mich.App. 608, 402 N.W.2d 13, 15-16 (1986) (only mention of an Indian tribe was in reference to renting a house on a reservation).
A few courts have required slightly more before deeming the notice obligation to have attached. For example, courts in New Jersey and North Dakota have required some evidence or offer of proof to support an assertion by counsel. J.O., 743 A.2d at 347 (affidavit would suffice to trigger notice if "amorphous" statement by counsel is the only indication of Indian heritage); In re A.L., 623 N.W.2d 418, 421 (N.D.2001) (while party cannot rely solely upon "vague" statement by counsel, testimony of the child's biological parents would be enough to require notice); see also In re Appeal in Maricopa County, 136 Ariz. 528, 667 P.2d 228, 232-33 (App.1983) (paternity of putative Indian father must be acknowledged or established before notice provisions apply).
Because membership is peculiarly within the province of each Indian tribe, sufficiently reliable information of virtually any criteria upon which membership might be based must be considered adequate to trigger the notice provisions of the Act. These criteria have included, but are not necessarily limited to, such considerations as enrollment, blood quantum, lineage, or residence on a reservation. See Broncheau, 597 F.2d at 1263. Because the protection of a separate tribal interest is at the core of the ICWA, see Holyfield, 490 U.S. at 52, 109 S.Ct. 1597, otherwise sufficiently reliable information cannot be overcome by the statements, actions, or waiver of a parent, id. at 49, 109 S.Ct. 1597, or disregarded as untimely, T.L.G., 108 P.3d at 162 n. 26 (citing In re Junious M., 144 Cal.App.3d 786, 193 Cal. Rptr. 40 (1983)).

III.
In light of the Act's intent to permit Indian tribes to decide for themselves whether children whose custody is at issue are tribal members or eligible children of tribal members, there can be little doubt, on the record before us, that notice should have been given pursuant to both federal and state law. As a result of its "diligent search," the department produced a report acknowledging X.H.'s Indian ancestry through her mother and her grandmother. Although the department's information did not include specific attribution, neither was it challenged or impeached, and it was clearly relied upon for representation to the court. Even in the absence of the grandmother's direct testimony of Indian ancestry, the official report of the petitioning authority would be sufficient to provide reason to believe the child was of Indian ancestry.
Importantly, the department never disputed and the district court never failed to credit the child's Indian ancestry. Although the court disbelieved the grandmother's protestations that she attempted to raise the issue earlier with the department and mistrusted her belated expression of concern after denial of a continuance, it openly accepted *305 the possibility that both the child's grandmother and mother might be eligible for membership in the Cherokee tribe as a result of their ancestry. It simply found that fact insufficient to trigger the Act, including the notice requirement. Like the court of appeals, the district court clearly equated membership in a tribe with formal enrollment or registration, and for that reason alone found that neither the child nor her mother was, at that time, a member of a federally recognized Indian tribe.
The record contains no evidence, and neither the district court nor the court of appeals purported to take judicial notice, of any law or practice of any federally recognized Cherokee tribe suggesting a membership requirement of formal enrollment. Rather, it remains unclear whether a federally recognized Cherokee tribe might have found X.H. or her mother to have been a member had it been given the opportunity to decide the question.[6] In fact, the lower courts simply misapprehended the requirements for membership in a tribe, as contemplated by the Act, and therefore found that there was not even an allegation, much less evidence, of current tribal membership.
Whether the child's mother denied applicability of the Act or not, and whether the child's grandmother actually expressed concerns about protecting the child's Indian heritage before the day of trial or not, the petitioning or filing party (the department) was clearly aware of the child's Indian ancestry, imposing upon it a duty of further inquiry and notice pursuant to the Act. In the circumstances of this case, including the identification of a small class of potentially concerned tribes, the department failed to fulfill its statutory obligation. Because it cannot be determined as a matter of law that neither the child nor her mother is a tribal member, the notice requirements of the Act must be met. See Junious M., 193 Cal.Rptr. at 46.

IV.
Accordingly, the judgment of the court of appeals is reversed and the matter is remanded with instructions to order that notice be given in accordance with the provisions of the Indian Child Welfare Act and the Colorado Children's Code. If it is ultimately determined, after proper notice, that X.H. is not an Indian child, the district court's order terminating parental rights shall stand affirmed. If X.H. is determined to be an Indian child, the district court must proceed in accordance with the Act.
Justice EID does not participate.
NOTES
[1] Indian Child Welfare Act of 1978, 92 Stat. 3069, 25 U.S.C. §§ 1901-1963 (2000).
[2] The Guidelines were authored by the Bureau of Indian Affairs and represent the Department of the Interior's interpretation of the ICWA. They are not binding. 44 Fed.Reg. at 67584; see Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 52 n. 26, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Nevertheless, they have been considered persuasive by state courts. E.g., In re Junious M., 144 Cal.App.3d 786, 193 Cal.Rptr. 40, 44 n. 7 (1983) (Guidelines entitled to "great weight"); In re H.D., 11 Kan.App.2d 531, 729 P.2d 1234, 1238 (1986) (Guidelines establish pretrial requirements); In re Dependency and Neglect of N.A.H., 418 N.W.2d 310, 311 (S.D.1988) ("better practice" to follow the Guidelines).
[3] In describing the Act's requirements, the Guidelines characterize the standard for notice as "reason to believe." Guidelines, 44 Fed.Reg. at 67586.
[4] The statute prescribes that notice shall be given to the parent or Indian custodian, the designated tribal agent, the highest-elected or appointed tribal judge, and the social services department of the tribe. § 191126(1)(b). If the tribe does not have a designated agent, notice shall be given to the highest-elected or appointed official of the child's tribe. Id.
[5] "`Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).
[6] There are three federally recognized Cherokee tribes: the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians of North Carolina, and the United Keetoowah Band of Cherokee Indians. Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 68 Fed.Reg. 68180, 68181, 68183 (Dec. 5, 2003). While all of them appear to have an enrollment procedure, it is far from clear that enrollment is a prerequisite to membership for ICWA purposes. See Cherokee Nation, Registration Instructions, http://www.cherokee.org/ (follow "Services" hyperlink; then follow "Registration" hyperlink) (last visited June 19, 2006); Cherokee North Carolina, Genealogy, http://www.cherokeenc.com/geneology.php?Name=Tribal Enrollment (last visited June 19, 2006); United Keetoowah Band of Cherokee Indians, Enrollment, http://unitedkeetoowahband.org/enrollment.htm (last visited June 19, 2006). For example, the Constitution of the Cherokee Nation (of Oklahoma) provides that its citizens are original enrollees or descendants of original enrollees listed on rolls dated in the 1860's. Cherokee Nation Const. art. IV, § 1. The Constitution of the United Keetoowah Band states that the governing body shall prescribe the rules governing membership, United Keetoowah Band Const. art. IV, § 2, and the current requirement appears to be at least 1/4 Keetoowah Cherokee blood, see United Keetoowah Bank of Cherokee Indians, Enrollment, http://unitedkeetoowahband.org/enrollment.htm.