Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2021 CO 33**

**No. 20SC533, *People in Interest of K.C. and L.C.*—Juvenile Court—Termination of Parent-Child Legal Relationship—Indian Child Welfare Act—Eligibility for Tribal Citizenship.**

This termination of parental rights proceeding involves two children who are eligible for enrollment in the Chickasaw Nation but who are not Indian Children, as defined by the Indian Child Welfare Act ("ICWA"). This case requires the supreme court to address whether (1) ICWA requires a district court to hold an enrollment hearing in circumstances like those present here as a prerequisite to the termination of parental rights; and (2) the Department of Human Services has an obligation to assist children who are eligible for enrollment in becoming enrolled citizens of a tribal nation.

All of the parties before the court, and the Nation itself, contend that the division erred in requiring an enrollment hearing. Because no statutory basis exists for such a hearing, and because such a hearing conflicts with the Nation's

exclusive right to determine who is an enrolled citizen, the court agrees that the division erred in requiring such a hearing.

With respect to the second issue presented, the court concludes that although the issue may call for legislative action, under current law, the Department has no obligation to assist children who are eligible for enrollment in becoming enrolled citizens of a tribal nation. The court notes, however, that it might well be the better practice for the Department to advise on and perhaps assist with the enrollment process.

Accordingly, the court reverses the judgment of the division below and reinstates the judgment of the district court terminating the parent-child legal relationships.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2021 CO 33**

**Supreme Court Case No. 20SC533**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA1682

**Petitioner/Cross-Respondent:**

The People of the State of Colorado,

**In the Interest of Minor Children:**

K.C. and L.C.,

v.

**Respondents/Cross-Petitioners:**

K.C. and L.C.,

**and Concerning Respondent:**

D.C.

**Judgment Reversed**
*en banc*
May 24, 2021

**Attorneys for Petitioner/Cross Respondent:**
Logan County Attorney's Office
Alan W. Samber, County Attorney
Kimberlee R. Keleher, Assistant County Attorney
  *Sterling, Colorado*

**Attorney for Respondents/Cross-Petitioners:**
Josi McCauley, Guardian ad litem
   *Fort Collins, Colorado*

**Attorneys for Respondent:**
Dodd Law, PC
Debra W. Dodd
   *Berthoud, Colorado*

**Attorneys for Amicus Curiae Chickasaw Nation**:
Indian Law Clinic, Michigan State University College of Law
Kathryn Fort
   *East Lansing, Michigan*

Chickasaw Nation Legal Division
Debra Gee
   *Ada, Oklahoma*

Van Ness Feldman, LLP
Laura Jones
   *Denver, Colorado*

**Attorney for Amicus Curiae Office of Respondent Parents' Counsel**:
Melanie Jordan
   *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**CHIEF JUSTICE BOATRIGHT** concurs.

¶1 This is a termination of parental rights proceeding involving two children who are eligible for enrollment as members of the Chickasaw Nation ("the Nation") but who are not Indian children, as defined by the Indian Child Welfare Act ("ICWA"), 25 U.S.C. § 1903(4) (2018). The court of appeals division below reversed a district court order terminating mother D.C.'s ("mother's") parental rights and ordered the district court on remand to conduct an enrollment hearing to determine whether the children's best interests mandate enrollment as citizens of the Nation. The Logan County Department of Human Services (the "Department") then petitioned for certiorari, the guardian ad litem ("GAL") cross-petitioned, and we granted those petitions.

¶2 In their petitions, the parties asked us to address whether (1) ICWA requires a district court to hold an enrollment hearing in circumstances like those present here as a prerequisite to the termination of parental rights; (2) a district court can order the Department to enroll children over a parent's objection; and (3) the division below erred in reversing the district court's judgment rather than ordering a limited remand.[1]

---

[1] Specifically, we granted certiorari to review the following issues:
1. Whether the Indian Child Welfare Act ("ICWA") requires the trial court to hold a "tribal enrollment hearing" to determine whether

¶3    All of the parties before us, and the Nation itself, agree that the division

erred in requiring an enrollment hearing.  Because we perceive no statutory basis

for such a hearing, and because such a hearing conflicts with the Nation's exclusive

right to determine who is an enrolled citizen, we agree that the division erred in

requiring such a hearing.[2]

¶4    With respect to the second issue presented, we note that neither parent

objected to the children's enrollment.  Accordingly, the issue as presented in the

petition for certiorari is not properly before us.  In their briefs, however, the parties

appear to construe the question presented more broadly, namely, as asking us to

---

it is in the children's best interest to become Indian Children as a pre-requisite to termination of parental rights.

2. Whether the trial court can order the Department to enroll children in an Indian tribe over a parent's objection during a "tribal enrollment hearing."

3. Whether the Court of Appeals, in departing from decisions of other divisions, erred in reversing the judgment of the trial court rather than limitedly remanding the proceedings for further determinations.

[2] We note that the terms "citizen" and "member" (and likewise "citizenship" and "membership"), as well as the terms "nation" and "tribe," are used interchangeably throughout our case law.  Because the Chickasaw Nation uses the terms "nation" and "citizen," we also strive do so.  In doing so, we further note that the use of "tribe" and "member" in the applicable statutory language is synonymous with the Nation's preferred nomenclature.

4

decide whether the Department has an obligation to assist children who are eligible for enrollment in becoming enrolled citizens of a tribal nation. Although the issue is an important one and may call for legislative action, we conclude that under current law, the Department has no such obligation. In certain circumstances, however, it might well be the better practice for the Department to advise on and perhaps assist with the enrollment process.

¶5 For these reasons, we reverse the judgment of the division below and need not reach the issue of whether a limited remand would have been appropriate.

## I. Facts and Procedural History

¶6 Twins K.C. and L.C. (the "children") were born about twelve weeks prematurely, and both tested positive for marijuana at birth. Their premature birth necessitated a prolonged stay in the neonatal intensive care unit, during which mother visited them only twice.

¶7 While the children were still in the hospital, the Department filed a motion for removal from the home and for temporary protective custody. In this motion, the Department asserted that allowing the children to continue to reside with mother would endanger their lives or health. The Department based this assertion on the children's positive drug tests, mother's lack of stable housing or transportation, and her history of felony drug charges. The district court granted the Department's motion.

¶8 Two days later, mother submitted forms declaring that the children were not members of any Indian tribe, they were not believed to be eligible for membership in any tribe, and no biological member of the children's family has American Indian or Alaska Native heritage.

¶9 The Department subsequently sought to ascertain the identity of the children's father, who was not then known (mother reported that any one of three individuals could be the father). Ultimately, T.B. ("father") was identified as the children's father.

¶10 In addition, the Department filed a dependency and neglect petition, and after the children were adjudicated dependent and neglected, treatment plans were adopted for both mother and father.

¶11 As pertinent here, after father was identified, he indicated that he had Chickasaw Native American heritage, although he himself was not a member of that Nation. Accordingly, pursuant to ICWA, the Department sent notices to the Nation, seeking confirmation of the children's Indian status, and filed with the district court a notice of the Department's certified mailings and signed return receipts.

¶12 The Nation subsequently responded in writing, "At this time, the children do not qualify as 'Indian Children' under [ICWA]." The Nation added, however, that the children and father were "eligible for citizenship" through the lineage of

6

the children's paternal grandfather, who was an enrolled citizen of the Nation. The Nation thus observed, "Once either the biological father or the children are enrolled, the children will qualify as 'Indian Children.'" And the Nation stated, "Although the ICWA does not yet apply in this case, we have a vested interest in the welfare of children who are eligible for citizenship with the Chickasaw Nation." The Nation therefore requested that the Department advise the children's parent or legal custodian to complete, on behalf of the children, enclosed applications for a Certificate of Degree of Indian Blood and for Chickasaw citizenship. The Department, however, does not appear to have advised either mother or father to complete these applications.

¶13 Five and a half months later, the Department filed a motion to terminate mother's and father's parental rights. In this motion, the Department asserted, among other things, that in addition to having "picked up 3 new felony charges out of Nebraska," mother did not comply with her treatment plan, remained unemployed and without stable housing, did not complete the court-ordered substance abuse or mental health treatment, and missed over 43% of her scheduled visits with the children. In addition, the Department attached the Nation's above-referenced response indicating that neither the children nor father were citizens of the Nation but that the children were eligible for citizenship. This

apparently marked the first time that the Department had disclosed the Nation's letter to mother and father.

¶14 Several weeks after the Department filed its motion to terminate, the district court held a review hearing and advised mother's attorney and father (mother did not appear) of respondent parents' rights relating to a motion to terminate the parent-child legal relationship. In connection with this advisement, the court stated that it was still operating under the assumption that ICWA might apply in this case, but it also noted that ICWA might not apply unless father took further action to enroll with the Nation. The court then confirmed with father that he had not chosen to enroll himself, and, after stating that the court could not enroll the children for father, the court asked father whether he had taken any steps toward enrollment or otherwise changed the children's status for ICWA purposes. Father replied, "No, I haven't." The court ended the hearing by reiterating that if the matter proceeded to termination, then the court might find that ICWA was inapplicable based on father's having taken no action to enroll with the Nation.

¶15 The matter then proceeded to a termination hearing. At this hearing, father confessed the motion to terminate, and the court again confirmed with father that he had not taken steps to enroll—and that it was his desire not to enroll—himself in the Nation. In addition, the Department stated on the record that father had indicated that he did not complete the paperwork that the Nation had provided to

8

enroll the children and that "it didn't sound like he had any desire to do so." And the court verified with mother that she had not enrolled the children with the Nation and that she herself had no Indian heritage.

¶16 After hearing all of the evidence, the court entered an order terminating mother's and father's parental rights. With respect to ICWA, the court expressly found that (1) it had inquired of both parents regarding the statute; (2) the Department had made diligent efforts to determine if the children were Indian children; and (3) based on the Nation's response to the Department's inquiries and father's decision not to enroll in the Nation, the children were not Indian children and thus ICWA did not apply. The court then noted that although it had made the requisite findings supporting termination by clear and convincing evidence, as required by state law, had the court been asked to do so, it "could easily [have found] that the allegations in the Motion to Terminate [had] been proven beyond a reasonable doubt," as ICWA would have required if it applied.

¶17 Mother appealed, arguing, among other things, that the judgment terminating her parental rights should be vacated because the Department had not taken steps to assist in enrolling the children in the Nation, as the Nation had requested. This, mother argued, ran afoul of the Department's statutory obligation to make reasonable efforts to reunite the family and further violated the Department's duty to secure ICWA protections when they were available.

9

¶18 In a unanimous, published opinion, the division vacated the judgment terminating mother's parental rights and remanded the case for further proceedings. *People in Interest of K.C.*, 2020 COA 86, ¶¶ 10, 36, __ P.3d __. Specifically, relying on different reasoning from that on which mother had relied, the division concluded that in dependency and neglect proceedings, when an Indian nation communicates to the county department of human services the nation's desire to obtain membership for enrollment-eligible children, the department must, at the earliest possible time, deposit the nation's response with the court. *Id.* at ¶ 10. The division continued that the court must then conduct an enrollment hearing to determine whether it is in the children's best interests to be enrolled as citizens of the requesting nation. *Id.* The division explained that at this hearing, the court "must hear and consider the positions of the parents, as well as the department and the guardian ad litem (GAL), all of whom have standing . . . to speak to the merits of the tribe's enrollment request." *Id.* at ¶ 24. The division did not indicate that the Nation should also be heard.

¶19 The Department petitioned this court for certiorari, the GAL cross-petitioned, and we granted both petitions.

## II. Analysis

¶20 We begin by setting forth our standard of review and the applicable principles of statutory construction. We then provide an overview of ICWA and

10

address whether ICWA requires the district court to conduct an enrollment hearing to determine whether enrollment as citizens of the Nation is in the children's best interest, as a prerequisite to terminating parental rights. Concluding that such a hearing is not required, we proceed to address whether the Department had an obligation to assist with the enrollment of the children. We conclude that it did not.

### A. Standard of Review and Principles of Statutory Interpretation

¶21 We review questions of statutory interpretation de novo. *People in Interest of L.M.*, 2018 CO 34, ¶ 13, 416 P.3d 875, 879. In construing a statute, we consider the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we interpret words and phrases in accordance with their plain and ordinary meanings. *Id.* In addition, we strive to avoid statutory constructions that either render words or provisions superfluous or ineffective or that lead to absurd results. *Id.*

¶22 In matters involving Indian law, however, we have observed that the "standard principles of statutory construction do not have their usual force." *B.H. v. People in Interest of X.H.*, 138 P.3d 299, 302 (Colo. 2006). "[T]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (quoting *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S.

226, 247 (1985)).  Thus, in matters of Indian law, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Id.*

## B.  Enrollment Hearing

¶23    Congress adopted ICWA in response to rising concerns "over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes."  *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989).  Congress found "that an alarmingly high percentage of Indian families [were] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children [were] placed in non-Indian foster and adoptive homes and institutions."  25 U.S.C. § 1901(4) (2018).  ICWA addresses these concerns by establishing "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."  25 U.S.C. § 1902 (2018).

¶24     ICWA applies to various child custody proceedings involving Indian children, including, as pertinent here, proceedings relating to the termination of parental rights. *See* 25 U.S.C. §§ 1903(1), (4), 1911, 1912 (2018). For purposes of ICWA, "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Eligibility alone, therefore, does not render a child an "Indian child" under ICWA. *See id.*

¶25     When ICWA applies, it imposes specific requirements on child custody proceedings in a state court. For example, in any involuntary proceeding in a state court, when "the court knows or has reason to know that an Indian child is involved," the party seeking to place the Indian child in foster care or to terminate parental rights "shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." 25 U.S.C. § 1912(a). In addition, in any state court proceeding seeking the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the tribe's reservation, the court, absent good cause, "shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe." 25 U.S.C. § 1911(b). And in a

13

state court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the child's Indian custodian and the Indian child's tribe "shall have a right to intervene at any point in the proceeding." 25 U.S.C. § 1911(c).

¶26 In addition to the foregoing, ICWA provides that the party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Moreover, prior to the entry of an order terminating the parental rights of an Indian child, the court must hear the testimony of "qualified expert witnesses" and make "a determination, supported by evidence beyond a reasonable doubt" (as opposed to the clear and convincing evidence standard used in non-ICWA, state court termination proceedings) "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). And last, if a court removes an Indian child from the custody of a parent or Indian custodian, or if the court terminates parental rights under state law, then the affected child, parent, Indian custodian, or nation "may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of [ICWA]." 25 U.S.C. § 1914 (2018).

¶27 Our General Assembly has incorporated each of these requirements into Colorado statutory law, § 19-1-126, C.R.S. (2020), and has also expressly adopted ICWA's definition of "Indian child," § 19-1-103(65.3), C.R.S. (2020).

¶28 Notably, tribal citizenship is not defined by ICWA. Rather, citizenship for purposes of ICWA is left exclusively to the control of each individual nation. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."); *Williams v. Gover*, 490 F.3d 785, 789 (9th Cir. 2007) ("An Indian tribe has the power to define membership as it chooses, subject to the plenary power of Congress."); *B.H.*, 138 P.3d at 303 ("Membership for purposes of [ICWA] is . . . left to the control of each individual tribe."); 25 C.F.R. § 23.108(b) (2021) ("The determination by a Tribe of whether a child is a member, whether a child is eligible for membership, or whether a biological parent is a member, is solely within the jurisdiction and authority of the Tribe, except as otherwise provided by Federal or Tribal law. The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe.").

¶29 If a state court determines, based on feedback from the relevant nation or other information that a child is not an "Indian child" under ICWA, then the court

15

may proceed under its usual standards. *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778, 38,806 (June 14, 2016); Bureau of Indian Affs., *Guidelines for Implementing the Indian Child Welfare Act* 12 (Dec. 2016), https://perma.cc/3TCH-8HQM ("*2016 Guidelines*"); *see also In re M.G.*, 2020 COA 66, ¶¶ 8–11, 465 P.3d 120, 121 (concluding that the juvenile court did not need to apply the standards required by ICWA because the child was not an "Indian child" as defined by ICWA).

¶30 As the foregoing principles make clear, nothing in ICWA (or under Colorado's implementing statute) provides for the type of best interests enrollment hearing that the division below mandated. To the contrary, ICWA simply does not apply when the children before the court are not Indian children, as defined by that statute.

¶31 Here, it is undisputed that the children are not "Indian children." Specifically, as noted above, ICWA defines an "Indian child" as any unmarried person under the age of eighteen who is either "(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (emphasis added); *accord* § 19-1-103(65.3). In this case, the children are not citizens of the Nation. And although they are eligible for citizenship, they do not satisfy the second criterion set forth in subsection (b) of 25 U.S.C. section 1903(4) because they are not the

biological children of a citizen of the Nation, given father's decision not to enroll himself therein. *See M.G.*, ¶ 9, 465 P.3d at 121 (concluding that a child did not meet ICWA's definition of an "Indian child" because the child was not a member of the nation at issue and although the child was eligible to enroll, her father was not a member of the nation but rather was also merely eligible for enrollment).

¶32 Accordingly, ICWA does not apply here, and we perceive no basis to engraft onto that statute a requirement for an enrollment hearing for children who are definitively not Indian children under ICWA.

¶33 Indeed, the enrollment hearing ordered by the division below appears to conflict with the Nation's exclusive right to decide matters of tribal citizenship. *See Santa Clara Pueblo*, 436 U.S. at 72 n.32; *B.H.*, 138 P.3d at 303. Specifically, as the division envisioned it, the district court would conduct an enrollment hearing to decide whether it is in the children's best interests to be enrolled in the Nation. *K.C.*, ¶ 32. If the court decides that it is, then the court would direct the Department to work diligently with the Nation and to assist with the submission of any application materials necessary for the children's enrollment, after which the court would enter a legal determination that the children met ICWA's definition of Indian children. *Id.* But the court would do all of this without any apparent involvement of the Nation in the enrollment hearing, contrary to the Nation's exclusive right to decide questions of tribal citizenship. *See id.* at ¶ 24

(noting who is to participate in the enrollment hearing but not including the Nation).

¶34 Such a procedure would also contravene ICWA's stated purpose of rectifying the states' past failures "to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5).

¶35 As a result, although we acknowledge and understand the division's effort to implement what it reasonably perceived as the policy objectives of ICWA, in our view, establishing a requirement for an enrollment hearing is a matter better left to Congress. Accordingly, we conclude that ICWA does not require the district court to hold a tribal enrollment hearing to determine whether it is in the children's best interest to enroll in the Nation, as a prerequisite to terminating parental rights.

¶36 In so concluding, we are not persuaded by mother's and the GAL's argument that, although an enrollment hearing is unwarranted, a remand is nonetheless necessary because the Department did not follow the ICWA notice procedures described above. As an initial matter, we note that we did not grant certiorari on the question of whether the notices that the Department provided in this case complied with ICWA. In any event, the record before us demonstrates that they did. Indeed, in its amicus brief, the Nation concedes this point: "In this

case, notice is not at issue. To the contrary, the Department did satisfy the notice requirement by contacting the Nation."

## C. The Department's Obligations

¶37 The Department next asks us to consider whether a district court can order the Department to enroll children in a tribal nation over a parent's objection. As an initial matter, we note that neither parent objected to the children's enrollment in the Nation here. Thus, the issue as presented in the Department's petition for certiorari is not properly before us.

¶38 This does not end our analysis, however, because, despite the framing of the question on which we granted certiorari review, the parties have addressed at length the broader question of whether the Department has an obligation, in any case, to assist in the enrollment of eligible children. Because this question would be significant in any matter to which ICWA applies and that involves an enrollment-eligible child, and because this question was fully briefed and argued before us, we will proceed to address it.

¶39 Both federal and state law provide for the Department's obligations in cases like that before us. In our view, however, neither federal nor state law imposes on the Department any obligation to assist in enrolling eligible children in a tribal nation.

¶40　As noted above, under federal law, any party seeking, among other things, to terminate the parental rights of an *Indian child* "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."  25 U.S.C. § 1912(d).

¶41　The applicable federal regulations define "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an *Indian child* with his or her family."  25 C.F.R. § 23.2 (2021) (emphasis added). These efforts "must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan."  *Id.*

¶42　Section 23.2 of the applicable federal regulations further provides that "active efforts" may include, for example:

> (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
>
> (2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
>
> (3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6) Taking steps to keep siblings together whenever possible;

(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11) Providing post-reunification services and monitoring.

*Id.*

¶43    Here, as discussed above, the children are not Indian children.  Accordingly, it does not appear that the "active efforts" obligation applies.  Indeed, this is fully consistent with the *2016 Guidelines* noted above, which state that once the court

21

determines that the child involved is not an Indian child, the state may proceed under its usual standards. *See 2016 Guidelines*, at 12.

¶44    Even if the children could be deemed Indian children, however, the regulations do not include enrollment assistance as part of the required active efforts. To the contrary, the Bureau of Indian Affairs expressly rejected a proposal that the regulations regarding "active efforts" be amended to include a requirement that the Department assist a child in applying for tribal citizenship. *See* 81 Fed. Reg. at 38,815 (Rejecting a proposal to include efforts to apply for tribal membership for a child as an example of active efforts, the Bureau of Indian Affairs stated, "The rule does not include a requirement to conduct active efforts to apply for Tribal citizenship for the child. The Act requires active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family. This does not clearly encompass active efforts to obtain Tribal citizenship for the child."). And as title 25, section 23.2 of the Code of Federal Regulations makes clear, the primary goal of the "active efforts" requirement concerns the family unit and strives to provide services that will permit children to stay or be reunited with their family, rather than the enrollment of a child in a tribal nation.

¶45    We likewise see nothing in Colorado state law that imposes on the Department an obligation to assist in tribal enrollment.

¶46 Under section 19-1-126(1)(a)(I), in all child custody proceedings filed pursuant to the Children's Code, the district court "shall make inquiries to determine whether the child who is the subject of the proceeding is an Indian child." If, after conducting these inquiries, the court has "reason to know that a child is an Indian child," then the Code triggers certain notice and filing obligations related to a nation's rights. *See* §§ 19-1-126(1)(a)(II), (b), (c). If, in contrast, "there is reason to know the child is an Indian child but the court does not have sufficient evidence to determine that the child is or is not an Indian child," then the court shall confirm that the Department

> used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member, or eligible for membership, to verify whether the child is in fact a member, or a biological parent is a member and the child is eligible for membership.

§ 19-1-126(2)(a). And the Code provides that the court shall "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an Indian child." § 19-1-126(2)(b).

¶47 Here, the Department made the required inquiries, and after the Nation's response to those inquiries was filed with the court and the court made repeated inquiries of mother and father, the court determined on the record that the children were *not* Indian children, as defined by ICWA. The Department thus satisfied its obligations under state law to determine the children's Indian status.

23

¶48     Nor did the Department's obligation to exercise "reasonable efforts" on behalf of the family require the Department to assist mother and father in enrolling the children in the Nation.  In any termination of parental rights proceeding, the Department must make "reasonable efforts" to "prevent the placement of abused and neglected children out of the home and to reunify the family whenever appropriate."  § 19-3-100.5(1), C.R.S. (2020); *see also People in Interest of A.A.*, 2020 COA 154, ¶ 30, 479 P.3d 57, 63 (concluding that the juvenile court erred in terminating a mother's parental rights because the record did not support a determination that the Department had made reasonable efforts to reunite the mother with her children); *cf. Watley v. Dep't of Child. & Fams.*, No. 3:13-cv-1858(RNC), 2019 WL 7067043, at *2 (D. Conn. Dec. 23, 2019) ("[T]he reasonable efforts requirement in state law aligns with federal law, which prohibits a state from seeking to terminate parental rights without first making reasonable efforts to preserve the family . . . .").

¶49     "Reasonable efforts" are defined as "the exercise of diligence and care throughout the state of Colorado for children who are in out-of-home placement, or are at imminent risk of out-of-home placement," with the child's health and safety being the "paramount concern."  § 19-1-103(89).  Toward that end, services that are provided in accordance with section 19-3-208, C.R.S. (2020), are deemed to satisfy the reasonable efforts standard.  § 19-1-103(89).  These services include,

among others, screening, assessment, counseling, information and referral, visitation, and placement services. § 19-3-208(2)(b). Such services are designed to (1) promote the health, safety, and well-being of children eligible for such services; (2) reduce the risk of future maltreatment of children who have previously been abused or neglected; (3) avoid the unnecessary placement of children into foster care; (4) facilitate the speedy reunification of parents and their children, if appropriate; (5) ensure that the placement of a child is neither delayed nor denied due to the child's race, color, or national origin; and (6) promote the best interests of the child. § 19-3-208(2)(a).

¶50    Notably, as with the federal "active efforts" requirement discussed above, nowhere do sections 19-1-103(89), 19-3-100.5(1), 19-3-208, or any other pertinent Colorado statute require that the Department enroll or assist in the enrollment of an eligible child in a nation. Moreover, the record reflects that the Department here made the requisite reasonable efforts to rehabilitate this family.

¶51    For these reasons, we cannot say that either federal or state law mandates that the Department assist eligible children to enroll in a nation. Again, if either Congress or the General Assembly intended otherwise, then it is in the best position to impose such a requirement.

¶52    We are not persuaded otherwise by Congress's general findings in 25 U.S.C. section 1901(3) that "the United States has a direct interest, as trustee, in protecting

25

Indian children who are members of or are eligible for membership in an Indian tribe." Although we acknowledge this general statement of policy, we are bound to follow the specific mandates contained in ICWA. We further note that Congress's finding related to children who "are eligible for membership in an Indian tribe" is limited to "Indian children," the definition of which, as discussed above, requires not only eligibility for citizenship in a nation but also that a biological parent be a citizen as well.

¶53    Accordingly, we conclude that the Department is under no legal obligation to enroll (or to assist in enrolling) an eligible child in a nation prior to the termination of parental rights. That said, we hasten to add that we in no way intend to foreclose a human services department from providing such assistance or from advising respondent parents as to the ramifications (and potential benefits) of their children's enrollment in a tribal nation. Indeed, in a given case, it might well be the best practice to do so. *See 2016 Guidelines*, at 22 ("It is thus a recommended practice for the social worker (or party seeking placement in a voluntary adoption) to facilitate the child becoming a member, such as by assisting with the filing of a Tribal membership application or otherwise.").

¶54    We need not attempt to elucidate here, however, what might be best practices in a given case. For present purposes, it suffices for us to note that nothing in this opinion should be read to prohibit the Department from, as

appropriate, assisting respondent parents in enrolling their eligible children in a tribal nation.

¶55 In light of our foregoing disposition, we need not consider whether the division should have ordered a limited remand in this case.

## III. Conclusion

¶56 For these reasons, we conclude that ICWA does not require the district court to hold a tribal enrollment hearing to determine whether it is in the children's best interest to become Indian children, as a prerequisite to the termination of parental rights. We further conclude that neither federal nor Colorado law obligates the Department to assist with or facilitate the children's enrollment in a tribal nation, although in a given case, it might be the better practice for the Department to do so.

¶57 Accordingly, we reverse the judgment of the division below and reinstate the judgment of the district court terminating the parent-child legal relationships.

**CHIEF JUSTICE BOATRIGHT** concurs.

CHIEF JUSTICE BOATRIGHT, concurring.

¶58 Today, the majority holds that the court of appeals erred by requiring the district court to hold an "enrollment hearing" in this case. Maj. op. ¶ 32. I agree. The majority also states that departments of human services are not under any obligation to assist parents of an ICWA-eligible child in enrolling their child in the specific tribe involved, but recognizes that in certain cases, it might be a "best practice" to do so. *Id.* at ¶ 53. But, in my view, it is more than a "best practice." Therefore, I write separately because I believe that, in order to satisfy "reasonable efforts," the department of human services must educate an ICWA-eligible child's parents on the advantages of enrollment in the specific tribe involved and then assist the parents in enrolling the child in the tribe if that is what the parents decide is in the child's best interest.

¶59 The Children's Code requires that the state make "reasonable efforts" to promote the reunification of families and that each county or city and county serve children's best interests through these reasonable efforts. §§ 19-3-100.5, -208, C.R.S. (2020). Enrollment in an Indian tribe may present myriad opportunities for an eligible child. Of course, Indian tribes are not homogenous. Rather, they are "'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (quoting *Worcester v. Georgia*, 31 U.S. 515, 559 (1832)). Each has its

own interests and resources. Accordingly, the advantages of enrollment in one tribe differ from the advantages of enrollment in another tribe. Most people are unfamiliar with these advantages.

¶60 Here, K.C. and L.C. were eligible for enrollment in the Chickasaw Nation ("Nation") through their father. At the termination of parental rights hearing, the district court inquired of both parents whether they had taken steps to enroll the children, and both parents indicated that they had not. Notably, neither parent argued at that time that the Logan County Department of Human Services ("Department") had failed to satisfy "reasonable efforts" by not assisting them in enrolling K.C. and L.C.

¶61 The mother later appealed the district court's termination judgment, arguing that the Department had failed to make "reasonable efforts" by not assisting her in enrolling K.C. and L.C. in the Nation. She contended that, because assistance with enrollment would facilitate the speedy reunification of parents and children, such assistance was required under sections 19-1-103(89) and 19-3-208, C.R.S. (2020). The court of appeals did not address whether the Children's Code alone imposed such a duty on the Department.[1] Instead, the court vacated the

---

[1] The court of appeals did state that if the Department had notified the district court of the Nation's response, then that notification would have "satisfied any ICWA notice responsibilities it has under sections 19-1-103(89) and 19-3-208."

2

judgment and remanded the case. *People in Interest of K.C.*, 2020 COA 86, ¶ 10, __ P.3d __. It concluded that the Department should have notified the district court of the Nation's response to the Department's notice of K.C.'s and L.C.'s eligibility and the court should have, in turn, held an enrollment hearing. *Id.*

¶62 The majority holds that the court of appeals erred by mandating an enrollment hearing, and I agree. Maj. op. ¶ 35. The majority further opines, however, that educating the parents on the advantages of enrollment in a tribe is sometimes a "best practice."[2] *Id.* at ¶ 53. In my opinion, it is more than that. I believe that where a child is eligible for enrollment in an Indian tribe, the department of human services, in order to satisfy "reasonable efforts," *must* educate the child's parents on the advantages of enrollment in the specific tribe involved and then assist the parents in enrolling the child in the tribe if that is what the parents decide is in the child's best interest. Providing this education and

---

*People in Interest of K.C.*, 2020 COA 86, ¶ 11, __ P.3d __. As the majority correctly holds, though, ICWA does not apply in this case because K.C. and L.C. are not yet "Indian child[ren]" under 25 U.S.C. § 1903(4). Maj. op. ¶¶ 31–32.

[2] As the majority points out, the issue on which we granted certiorari actually asked us to decide whether the district court could require the Department to enroll the children over a parent's objection. *See* maj. op. ¶¶ 4, 37. As neither parent objected to enrollment, that issue is not properly before us. I take this opportunity, like the majority, to address the broader issue briefed by the parties: whether the department had any obligation to assist the parents in enrollment.

assistance falls under "reasonable efforts" because if parents are unfamiliar with the tribe and the potential services that it can provide, then the parents cannot make an informed decision about enrolling their children.

¶63 Colorado recognizes that federal law "requires that each state make a commitment to make 'reasonable efforts' to prevent the placement of abused and neglected children out of the home and to reunify the family whenever appropriate." § 19-3-100.5(1). The state makes "reasonable efforts" when each county "provides services in accordance with section 19-3-208." § 19-3-100.5(5). Section 19-3-208, in turn, requires that the services "be designed to . . . [p]romote the immediate health, safety, and well-being" and "best interests of the child." § 19-3-208(2)(a)(I), (VI). Indeed, "'[r]easonable efforts' means the exercise of diligence and care for children who are placed out of the home, but the primary considerations in a termination proceeding are the physical, mental, and emotional conditions and needs of the children." *People in Interest of T.D.*, 140 P.3d 205, 218–19 (Colo. App. 2006), *abrogated on other grounds by People in Interest of A.J.L.*, 243 P.3d 244 (Colo. 2010); *see* § 19-3-604(3), C.R.S. (2020).

¶64 The services required by "reasonable efforts" will necessarily depend on the circumstances surrounding the dependency and neglect case and must be tailored "as determined necessary and appropriate." § 19-3-208(2)(b). Aware of the fact-specific nature of these duties, the legislature requires that each county provide

4

and implement "individual case plans." § 19-3-208(2)(b)(I). Each county must also provide, "as determined necessary and appropriate," § 19-3-208(2)(b), "[i]nformation and referral services to available public and private assistance resources," § 19-3-208(2)(b)(III). When a child is identified as eligible for enrollment in a tribe, requiring a department to educate parents on the advantages of enrollment and assist the parents in enrolling the child if the parents determine that enrollment is in the child's best interest, in my view, should be part of the individual case plan tailored to the specific child's needs. *See, e.g.*, *People in Interest of S.M.A.M.A.*, 172 P.3d 958, 963–64 (Colo. App. 2007) (discussing treatment plans possibly including home-based counseling and referrals to public and private assistance resources when necessary).

¶65 Here, the Nation was identified and had verified that the children were eligible for enrollment. All that needed to be done was to have one of the parents fill out an application. Under such facts, educating the parents and assisting them with enrollment is—at the very least—reasonable. This is especially clear when one considers the significant public policy interests implicated by a child becoming an "Indian child" under ICWA and the fact that different tribes offer their members vastly different benefits, services, and opportunities.

¶66 In this case, nothing in the record indicates that K.C. and L.C.'s parents were educated on the advantages that citizenship in the Nation might have offered their

5

children.  This is especially unfortunate because, had they been so educated, their decision to pursue enrollment for K.C. and L.C. might have been different. Nevertheless, neither parent argued at the termination hearing that the Department had failed to satisfy "reasonable efforts."  Both, in fact, acknowledged their decision not to enroll K.C. and L.C. when asked by the court.  Under these facts, I agree with the majority's judgment reinstating the termination judgment.

¶67    Still, in my view, the obligation to educate parents of ICWA-eligible children on the advantages of enrollment in a specific tribe and to then assist the parents in enrolling the children if the parents decide to pursue enrollment goes beyond a "best practice."  To so educate and then assist should be recognized as an obligation under "reasonable efforts."  Accordingly, I concur.