21CA0178 Peo in Interest of KS 10-21-2021 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0178 Mesa County District Court No. 19JV2 Honorable Brian J. Flynn, Judge The People of the State of Colorado, Appellee, In the Interest of K.S., a Child, and Concerning D.D., Appellant. JUDGMENT AFFIRMED Division VII Opinion by JUDGE GROVE Navarro and Pawar, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced October 21, 2021 Todd M. Starr, County Attorney, Katherine A. Barnes, Assistant County Attorney, Grand Junction, Colorado, for Appellee Tammy Tallant, Guardian Ad Litem The Morgan Law Office, Kris P. Morgan, Colorado Springs, Colorado, for Appellant 
1 ¶ 1 D.D. (mother) appeals the judgment terminating the parent-
child legal relationship with K.S. (the child). We affirm. I. Background ¶ 2 In January 2019, the Mesa County Department of Human Services filed a petition in dependency and neglect regarding the then-five-year-old child based on concerns about neglect, substance abuse, domestic violence, and mother’s incarceration. ¶ 3 The juvenile court adjudicated the child dependent and neglected. The court then adopted a treatment plan for mother. Mother appealed the adjudicatory judgment. ¶ 4 The Department later moved to terminate mother’s parental rights. Two years after the petition was filed, following a hearing, and while the appeal of the adjudicatory judgment was pending, the juvenile court terminated mother’s parental rights. ¶ 5 Mother appealed the termination judgment. Shortly thereafter, a division of this court affirmed the adjudicatory judgment. See People in Interest of K.S., (Colo. App. No. 19CA2361, June 3, 2021) (not published pursuant to C.A.R. 35(e)). 
2 II. Indian Child Welfare Act ¶ 6 Mother contends that the juvenile court did not comply with the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-
1963. Specifically, she asserts that the notice sent to the Tribes did not include information about the child’s paternal relatives. We discern no basis for remand. A. Law ¶ 7 ICWA serves to protect and preserve Indian tribes and their resources, and to protect Indian children who are members or eligible for membership in an Indian tribe. 25 U.S.C. § 1901(2), (3). To that end, ICWA establishes minimal federal standards for child custody proceedings. 25 U.S.C. § 1902; People in Interest of D.B., 2017 COA 139, ¶ 12. An Indian child is an unmarried person under the age of eighteen who is either (1) a member of an Indian tribe or (2) eligible for membership in an Indian tribe and the biological child of a tribal member. 25 U.S.C. § 1903(4). ¶ 8 Indian tribes are responsible for determining tribal membership and eligibility for membership. See 25 C.F.R. § 23.108(a)-(c) (2020); see also People in Interest of J.A.S., 160 P.3d 257, 260 (Colo. App. 2007). ICWA also recognizes that Indian tribes 
3 have an interest in Indian children that is distinct from, but equal to, parental interests. B.H. v. People in Interest of X.H., 138 P.3d 299, 303 (Colo. 2006); see also Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 52 (1989). Accordingly, in a proceeding in which ICWA may apply, tribes must have a meaningful opportunity to participate in determining whether a child is an Indian child and to be heard on the issue of ICWA’s applicability. B.H., 138 P.3d at 303. ¶ 9 To ensure tribes have an opportunity to be heard, Colorado’s ICWA-implementing legislation provides that the petitioning party in dependency and neglect proceedings must make continuing inquiries to determine whether the child is an Indian child. § 19-1-
126(1)(a), C.R.S. 2020; see also B.H., 138 P.3d at 302. ¶ 10 If the juvenile court knows or has reason to know that an Indian child is involved in a child custody proceeding, including termination of parental rights, the party seeking termination must provide notice to any identified Indian tribes. 25 U.S.C. § 1912(a); § 19-1-126(1)(b); see also People in Interest of L.L., 2017 COA 38, ¶ 29. In doing so, the Department must directly notify the tribe by registered mail with return receipt requested of the pending child 
4 custody proceeding and the tribe’s right to intervene. L.L., ¶¶ 34-
35. ¶ 11 The Department should try to provide sufficient information to allow the tribe to determine whether the child is a member or eligible for membership. Id. at ¶ 37. The notice must include, among other things, (1) The child’s name, birthdate, and birthplace; (2) All names known (including maiden, married, and former names or aliases) of the parents, the parents’ birthdates and birthplaces, and Tribal enrollment numbers if known; (3) If known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents; [and] (4) The name of each Indian Tribe in which the child is a member (or may be eligible for membership if a biological parent is a member)[.] 25 C.F.R. § 23.111(d)(1)-(4) (2020). ¶ 12 Additionally, in 2016, the Bureau of Indian Affairs issued Guidelines implementing ICWA. L.L., ¶ 15; see Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016), https://perma.cc/3TCH-8HQM; see also Notice of 
5 Guidelines, 81 Fed. Reg. 96,476 (Dec. 30, 2016). Although the 2016 Guidelines are not binding, they provide useful guidance in interpreting ICWA. People in Interest of L.H., 2018 COA 27, ¶ 6. ¶ 13 Whether ICWA’s provisions were satisfied is a question of law that we review de novo. See People in Interest of T.M.W., 208 P.3d 272, 274 (Colo. App. 2009). B. Analysis ¶ 14 Based on mother’s assertion of possible Blackfeet or Cherokee heritage, the Department sent notice to the Blackfeet Tribe, the Cherokee Nation, Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians. The notice contained information about the child, the parents, and the maternal relatives. ¶ 15 The Blackfeet Tribe, the Cherokee Nation, and Eastern Band of Cherokee Indians responded and indicated that the child was not a member or eligible for membership. ¶ 16 The record shows that the child’s paternal grandmother claimed no Indian heritage and filled out a Declaration of Non-
Indian Heritage form. According to a Family Services Plan, the caseworker located the child’s father, whom she asked about 
6 possible Indian heritage. Father denied any such heritage but he refused to sign a Declaration of Non-Indian Heritage form. ¶ 17 At the termination hearing, the juvenile court found that there had been compliance with ICWA’s requirements and that the child was not an Indian child pursuant to ICWA. ¶ 18 We agree with mother that the Department’s notice to the Tribes was lacking because it did not include information about the paternal relatives. See L.L., ¶ 37. We remind the juvenile court to ensure that notice includes names, birthdates, birthplaces, and Tribal enrollment information of the child’s direct lineal ancestors, if known. 25 C.F.R. § 23.111(d)(3). ¶ 19 However, given that the paternal grandmother and the child’s father denied Indian heritage, it is unclear what additional information about the paternal relatives would have been helpful for the Tribes to determine whether the child was a member or eligible for membership. In other words, the only assertion of Indian heritage was related to the maternal family; therefore, the lack of information in the notice about the paternal family was harmless. See People in Interest of N.D.C., 210 P.3d 494, 498 (Colo. App. 2009). 
7 III. Pending Appeal of the Adjudicatory Judgment ¶ 20 Mother contends that the juvenile court erred by terminating her parental rights while the appeal of the adjudicatory judgment was pending. In particular, she asserts that the court lacked jurisdiction to enter the termination judgment and that terminating her parental rights while the appeal was pending was fundamentally unfair and not in the child’s best interest. We discern no basis for reversal. A. Jurisdiction to Enter Termination Judgment ¶ 21 We conclude that the juvenile court had jurisdiction to terminate mother’s parental rights during the appeal of the adjudicatory judgment. This is because an order terminating parental rights is a dispositional order and the court retains jurisdiction to enter dispositional orders under section 19-1-
109(2)(c), C.R.S. 2020. ¶ 22 Resolution of this issue requires statutory construction, which is a question of law that we review de novo. People in Interest of C.L.S., 313 P.3d 662, 665-66 (Colo. App. 2011). Our goal is to effectuate the legislature’s intent. Id. at 666. To determine the legislature’s intent, we begin by applying the plain language of the 
8 statute, giving words and phrases their ordinary meanings. Id. If the language is unambiguous, we do not resort to other methods of statutory construction. Id. ¶ 23 But if a term is susceptible to different interpretations, “we read the term in the context of the statutory scheme as a whole and attempt to give the term the meaning intended by the legislature.” Denver Post Corp. v. Ritter, 255 P.3d 1083, 1096 (Colo. 2011). Our interpretation should “produce a harmonious reading of the statutory scheme.” People in Interest of J.G., 2016 CO 39, ¶ 13. ¶ 24 The filing of a notice of appeal divests the lower court of jurisdiction to conduct further substantive action related to the judgment on appeal unless specifically authorized by statute or rule. People in Interest of S.B., 742P.2d 935, 940 (Colo. App. 1987); see also People in Interest of K.A., 155 P.3d 558, 561 (Colo. App. 2006). Section 19-1-109(2)(c) provides that [a]n order decreeing a child to be neglected or dependent shall be a final and appealable order after the entry of the disposition pursuant to section 19-3-508[, C.R.S. 2020]. Any appeal shall not affect the jurisdiction of the trial court to enter such further dispositional orders as the court believes to be in the best interests of the child. 
9 ¶ 25 Although the Children’s Code does not define “dispositional order,” section 19-3-508(1), C.R.S. 2020 contemplates two dispositions available to the juvenile court at the dispositional hearing: (1) termination of parental rights or (2) approval of a treatment plan. Id.; see also § 19-3-508(1)(e)(I) (“Except where the proposed disposition is termination of the parent-child legal relationship, the court shall approve an appropriate treatment plan.”); People in Interest of M.S., 2012 COA 211, ¶¶ 2-4 (“When the proposed disposition is termination of the parent-child legal relationship, the termination hearing serves as the dispositional hearing.”). ¶ 26 The plain language of section 19-3-508(1) establishes that, when a court finds that no appropriate treatment plan can be devised for a parent, an order terminating parental rights is a dispositional order. For the following reasons, we reach the same conclusion when the court initially approves a treatment plan. ¶ 27 First, the statute does not distinguish initial dispositional orders from later orders, and we “will not read into a statute an exception the plain language does not suggest.” K.A., 155 P.3d at 561. 
10 ¶ 28 Second, a juvenile court has broad authority to modify dispositional orders under section 19-3-508. When the court approves a treatment plan, it retains authority “to modify an existing dispositional order or to adopt any other order that it could have initially entered.” People in Interest of Z.P.S., 2016 COA 20, ¶ 27. For example, a court may amend treatment plans to address the changing needs of parents and children. See People in Interest of D.R.W., 91 P.3d 453, 459 (Colo. App. 2004). A court may also modify custody or placement orders. See People in Interest of P.L.B., 743 P.2d 980, 982 (Colo. App. 1987). A court may even hold a dispositional hearing and find that no appropriate treatment plan can be devised for a parent after the court has already approved a treatment plan for that parent. Z.P.S., ¶ 22. ¶ 29 Third, the dispositional statute as a whole contemplates that a court may enter a decree of termination either as the initial decree of disposition or later in the proceedings. Section 19-3-508(3)(a) provides that “[t]he court may enter a decree terminating the parent-child legal relationship of one or both parents” and establishes the time for hearing a motion to terminate parental rights. Subsections (1) and (3)(a) both reference part 6 of article 3 
11 of title 19, which establishes termination procedures and the criteria for termination. ¶ 30 Finally, section 19-1-109(2)(c) broadly states that, during an appeal from a juvenile court’s adjudicatory judgment, the court may enter any “such further dispositional orders as the court believes to be in the best interests of the child.” See K.A., 155 P.3d at 561 (holding that a court may enter permanent custody orders under sections 19-3-702 and 19-3-703, C.R.S. 2020, during an appeal of adjudication). The statute does not exclude dispositional orders that terminate the parent-child relationship. Had the legislature intended to impose such a limit, it could have said so. See In Interest of E.L.M.C., 100 P.3d 546, 555 (Colo. App. 2004). Instead, the juvenile court retains jurisdiction to enter such orders. B. Child’s Best Interest and Fundamentally Fair Procedure ¶ 31 Mother argues in the alternative that, even if the juvenile court had jurisdiction to enter the termination judgment, allowing parallel proceedings is fundamentally unfair. However, mother suffered no prejudice because while this appeal was pending, a division of this court affirmed the adjudicatory judgment. 
12 ¶ 32 That said, we acknowledge the possibility that, under different circumstances, an adjudicatory judgment might be reversed on appeal after the termination judgment has been entered, thus disrupting the child’s theoretically permanent placement. But, allowing the appeal of adjudicatory judgments and the entering of other dispositional orders to proceed on parallel tracks comports with the directives of the Children’s Code to expedite dependency or neglect cases and provide permanency for children. Indeed, the General Assembly has expressed its intent “to provide stable, permanent homes for every child or youth placed out of the home, in as short a time as possible.” § 19-3-702(1)(a). To that end, a juvenile court must conduct a permanency planning hearing no later than ninety-one days after the initial dispositional decree and must hold additional hearings at least every six months while the case is open. Id. If a court finds that reasonable efforts to reunify the child and the parent are not required under section 19-1-115(7), C.R.S. 2020, and a motion for termination has been filed, the court may combine the permanency planning hearing with the termination hearing. § 19-3-702(1)(b). And all children under the age of six when a petition is filed must be placed in permanent 
13 homes “as expeditiously as possible.” § 19-3-702(5)(c), C.R.S. 2020. ¶ 33 In K.A., a division of this court recognized that the legislative directive to place children in permanent homes as quickly as possible may result in removal from a permanent placement if an adjudicatory judgment is reversed on appeal. K.A., 155 P.3d at 562. Similarly, a termination judgment could be subject to reversal or collateral attack if the underlying adjudication fails. But nothing in section 19-1-109(2)(c) suggests any legislative intent to delay either permanent placement decisions or decisions to terminate parent-child relationships when these become necessary to serve the best interests of children. See K.A., 155 P.3d at 562; see also § 19-1-109(3) (recognizing that dependency or neglect appeals may take longer than six months to resolve). ¶ 34 Accordingly, we conclude that the juvenile court did not err when it terminated mother’s parental rights during the appeal of the underlying adjudication. IV. Unfitness ¶ 35 Mother contends that the juvenile court erred by finding that she was unfit. We do not agree. 
14 ¶ 36 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent’s conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2020; People in Interest of C.H., 166 P.3d 288, 289 (Colo. App. 2007). ¶ 37 An unfit parent is one whose condition or conduct renders him or her unable to give a child reasonable parental care. People in Interest of D.P., 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child’s physical, emotional, and mental health needs. People in Interest of A.J., 143 P.3d 1143, 1152 (Colo. App. 2006). ¶ 38 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 15. “We review the juvenile court’s findings of evidentiary fact — the raw, historical data 
15 underlying the controversy — for clear error and accept them if they have record support.” People in Interest of S.R.N.J-S., 2020 COA 12, ¶ 10. But we review de novo the juvenile court’s legal conclusions based on those facts. See id. ¶ 39 Here, the juvenile court found that mother was unfit because she had not made “sufficient progress towards becoming a fit parent.” Specifically, the court found that mother had “not engage[d] in treatment that was available to her, revoked releases of information that were necessary to release test results and ha[d] not maintained adequate housing.” ¶ 40 The record supports the juvenile court’s findings. Mother did not consistently engage in substance abuse or mental health treatment. The caseworker testified that it was recommended that mother participate in thirty-six sessions of individual mental health counseling, group counseling, and NA or AA support groups. Mother testified that she had participated in four or five mental health counseling sessions. The caseworker also testified that she had authorized two hair follicle tests but there was no record of mother taking the tests at the drug screening facility. Mother 
16 confirmed that although she had completed a hair follicle test, she had not given the results to the Department. ¶ 41 Mother revoked releases of information, making it difficult for the Department to gather information about her treatment and progress. The caseworker testified that she had asked mother to re-
sign the releases of information but mother had not responded. ¶ 42 The record also shows that it was difficult for the Department to verify mother’s housing. The caseworker testified that mother had given different addresses, some of them nonexistent. Mother testified that she had housing for the past year. The housing authority eligibility technician testified that mother was on a Section 8 housing voucher waiting list. ¶ 43 The caseworker opined that mother was unfit because she had “not made significant progress” in treatment. ¶ 44 Given this evidence, we conclude that the record supports the juvenile court’s findings about mother’s unfitness. Therefore, we will not disturb those findings and the court’s legal conclusions on appeal. 
17 V. Less Drastic Alternatives ¶ 45 Mother contends that the juvenile court erred by finding that there were no less drastic alternatives to termination. Specifically, she argues that the court could have granted an allocation of parental responsibilities (APR) to the maternal grandmother. We discern no basis for reversal. ¶ 46 The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. People in Interest of D.P., 181 P.3d 403, 408 (Colo. App. 2008). In considering less drastic alternatives, the court bases its decision on the best interests of the children, giving primary consideration to their physical, mental, and emotional conditions and needs. § 19-
3-604(3). ¶ 47 Here, the juvenile court found that there were no alternatives to termination that would be in the child’s best interest. The court found that given the child’s age, it was essential to her well-being “that she [be] given the opportunity to be in a permanent home as soon as possible so that she does not lose her ability to bond with caregivers” or otherwise benefit from permanent stability through adoption. 
18 ¶ 48 The record supports the juvenile court’s findings. The case had been open for two years and the child needed stability and consistency. And when, as here, the child was less than six years old when a petition in dependency and neglect is filed, the expedited permanency planning provisions apply. § 19-1-123(1)(a), C.R.S. 2020. The guidelines in effect at the time of the termination hearing required the juvenile court to place the child in a permanent home “as expeditiously as possible.” § 19-3-702(5)(c). At the time of the termination hearing, the child had been living with the maternal grandmother for almost two years. ¶ 49 The record indicates that the Department and the maternal grandmother preferred adoption over an APR. The grandmother testified that she was not willing to have an APR because of her experience having an APR with mother’s older children and mother’s behavior. In particular, the grandmother testified about mother sneaking by the home to drop off gifts for the child. The grandmother also testified about having a “distant, non-
communicating” relationship with mother. The caseworker testified that an APR would be a detriment to the child because “it would 
19 cause her to be more dysregulated and continue to have sporadic contact with [mother].” ¶ 50 We conclude that the record supports the juvenile court’s findings regarding less drastic alternatives, and we will not disturb them or the court’s legal conclusions on appeal. VI. Conclusion ¶ 51 We affirm the judgment. JUDGE NAVARRO and JUDGE PAWAR concur.