20CA2022 Peo in Interest of DF 01-27-2022 COLORADO COURT OF APPEALS Court of Appeals No. 20CA2022 Logan County District Court No. 18JV40 Honorable Michael K. Singer, Judge The People of the State of Colorado, Appellee, In the Interest of Dem.F., Ki.F., Dek.F., Ky.F., Children, and Concerning T.F. and C.S., Appellants. JUDGMENTS AFFIRMED Division III Opinion by JUDGE J. JONES Lipinsky and Gomez, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 27, 2022 Alan Samber, County Attorney, Kimberlee R. Keleher, Assistant County Attorney, Sterling, Colorado, for Appellee Barry Meinster, Guardian Ad Litem Michael Kovaka, Office of Respondent Parents’ Counsel, Littleton, Colorado, for Appellant T.F. Patrick R. Henson, Office of Respondent Parents’ Counsel, Denver, Colorado, for Appellant C.S. 
1 ¶ 1 In this dependency and neglect proceeding, T.F. (father) and C.S. (mother) separately appeal the juvenile court’s judgments terminating their parent-child legal relationships with their children. We affirm both judgments. I. Procedural History ¶ 2 In December 2018, the Logan County Department of Human Services filed a dependency and neglect petition regarding five-year-
old Dem.F., three-year-old Ki.F., two-year-old twins Dek.F. and Ky.F., and an older half-sibling who isn’t subject to this appeal. In support of the petition, the Department asserted that • mother’s home was in dire condition and an investigating caseworker had smelled a foul odor coming from the home even before opening the door; • the twins were found locked in a basement bedroom that had large bags of dirty diapers and was covered in flies as well as urine and fecal matter; • the twins, who were each in a separate “pack-n-play” with no diaper, were covered in urine, fecal matter, rashes, and scabs; • mother reported that she would bring the twins upstairs for “an hour at a time”; and 
2 • medical staff had diagnosed the twins with dehydration, full-
body dermatitis, and severe neglect. ¶ 3 The juvenile court placed the children in the Department’s custody. Mother admitted that the children were in an injurious environment, while father, who was incarcerated when the case began, stipulated that the children were without proper care through no fault of his own. Based on these admissions, the court adjudicated the children dependent and neglected. At that time, the court also adopted a treatment plan for father. ¶ 4 Not long after that, the Department filed motions asking the court to determine that appropriate treatment plans could not be devised for the parents in relation to the twins and to terminate their parental rights on that basis. Mother relinquished her parental rights to the twins. And the Department withdrew the motions in relation to father. ¶ 5 In May 2019, the court issued a dispositional order adopting a treatment plan for mother. The court also issued a further dispositional order in relation to father and the twins. ¶ 6 Later, the Department moved to terminate father’s parental rights to each of the four children, as well as mother’s parental 
3 rights to Dem.F. and Ki.F. Following a hearing in October and November 2020, the juvenile court entered separate judgments granting the termination motions. ¶ 7 Mother and father separately appealed the termination judgments. At father’s request, this court stayed the appeal and remanded the case to the juvenile court to ensure compliance with the Indian Child Welfare Act of 1978 (ICWA). Specifically, we directed the juvenile court to have notice of the termination proceeding given to two federally recognized Miwok tribes identified in father’s request for a remand. After these notices were provided, the juvenile court determined that ICWA is inapplicable. We then denied father’s subsequent request to expand the remand to include eight other tribes in the same ancestral group and recertified the appeal. II. ICWA Compliance ¶ 8 To start, we consider father’s contention that the record doesn’t demonstrate compliance with ICWA’s provisions because no notice was given to eight of the eleven federally recognized Miwok tribes. 
4 A. The Law ¶ 9 ICWA’s provisions are for the protection and preservation of Indian tribes and their resources, and to protect Indian children who are members of or are eligible for membership in an Indian tribe. 25 U.S.C. § 1901(2), (3). ICWA also recognizes that Indian tribes have a separate interest in Indian children that is equivalent to, but distinct from, parental interests. B.H. v. People in Interest of X.H., 138 P.3d 299, 303 (Colo. 2006); see also Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 52 (1989). ¶ 10 If the court knows or has reason to know that an Indian child is involved in a child custody proceeding, including termination of parental rights, it must ensure that the Department provides notice to the potentially concerned tribe or tribes. 25 U.S.C. § 1912(a); § 19-1-126(1)(b), C.R.S. 2021; see also People in Interest of L.L., 2017 COA 38, ¶ 24. To adhere to ICWA’s notice provisions, the Department must directly notify each tribe by registered mail with return receipt requested of the pending child custody proceeding and its right to intervene. People in Interest of M.V., 2018 COA 163, ¶ 26. 
5 ¶ 11 Where the identity and location of the tribe is known, the Department must directly notify that tribe. See L.L., ¶ 34. If, on the other hand, the parent is only able to identify a tribal ancestral group, the Department must notify each of the tribes in that ancestral group. People in Interest of L.H., 2018 COA 27, ¶ 8. And copies of these notices must be sent to the appropriate regional director of the Bureau of Indian Affairs (BIA). 25 C.F.R. § 23.11(a) (2020); see also M.V., ¶ 28. ¶ 12 Whether ICWA’s notice requirements were satisfied is a question of law that we review de novo. See People in Interest of T.M.W., 208 P.3d 272, 274 (Colo. App. 2009). B. Analysis ¶ 13 In response to inquiry from the court at a hearing in January 2019, father indicated that he believed the children were enrolled or eligible to be enrolled in a Miwok tribe but was unsure of its location. However, during the same hearing, father’s counsel clarified that the tribe was the California Valley Miwok Tribe and requested the Department to look into “that tribe.” And, at a later hearing, counsel reiterated that father’s “family line is affiliated with the California Valley Miwok Tribe.” The BIA’s register of tribal 
6 agents identifies the California Valley Miwok Tribe as a federally recognized tribe. See Designated Tribal Agents for Service of Notice, 85 Fed. Reg. 24,004 (Apr. 30, 2020). ¶ 14 True, at the start of the termination hearing, the juvenile court recalled that “[father] did assert membership in the Miwok tribe in California.” And, as previously noted, this court remanded the case to ensure that notice was given to two additional Miwok tribes. At a hearing on remand, father told the court that he knew only that he was affiliated with a Miwok tribe, but he was unable to identify the specific tribe. But these circumstances don’t overcome the fact that at the time of the termination hearing, father had asserted that he and the children were affiliated with a specific Miwok tribe — the California Valley Miwok Tribe — as opposed to a general affiliation with the Miwok tribal ancestral group. ¶ 15 The Department gave notice of the proceeding to the California Valley Miwok Tribe, as well as the BIA. The California Valley Miwok Tribe responded by indicating that neither father nor the children are tribal members. Additionally, following the remand, the Department sent notice of the proceeding to two other federally 
7 recognized Miwok tribes. They also determined that the children are not tribal members or eligible for membership. ¶ 16 As a result, the record demonstrates compliance with ICWA. III. Qualification of Expert Witness ¶ 17 Next, we turn to mother’s assertion that the juvenile court abused its discretion by qualifying a therapist who evaluated her visits with Dem.F. and Ki.F. as an expert in infant mental health. ¶ 18 Expert testimony is testimony that could not be offered without specialized experience, knowledge, or training. Venalonzo v. People, 2017 CO 9, ¶ 23. CRE 702 governs the admissibility of expert testimony: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. ¶ 19 A court may qualify an expert witness under any of the five bases specified in CRE 702. Huntoon v. TCI Cablevision of Colo., Inc., 969 P.2d 681, 690 (Colo. 1998). The determination whether a witness is qualified to render an expert opinion is left to the court’s 
8 discretion. See id. We will uphold the court’s ruling unless it was manifestly arbitrary, unreasonable, or unfair. Id. ¶ 20 Mother correctly points out that the therapist acknowledged that she was still in the process of obtaining her certification in infant mental health. But contrary to mother’s assertion, a witness isn’t required to “hold a specific degree, training certificate, accreditation, or membership in a professional organization, in order to testify on a particular issue.” Id. ¶ 21 The record reveals that the therapist had education, experience, and training related to infant mental health. The therapist had a bachelor’s degree in psychology, a master’s degree in counseling, and a postgraduate certificate for treating children and adolescents. She had also been a registered play therapist for about six years, which required her to have training related to working with young children. ¶ 22 In addition to her education, the therapist had completed two internships — one working with mothers and their infants in a postpartum depression clinic and the other working with children through a mental health center. The therapist had also worked as an in-home provider supporting families involved in dependency 
9 and neglect cases. And, later, the therapist had opened her own practice, which involved treating children and families. ¶ 23 The therapist said that throughout her career she had annually participated in conferences and workshops focusing on attachment and bonding, which incorporated the mental health of infants. Indeed, the therapist explained that attachment and bonding had been an area of primary focus during her career. ¶ 24 Given this record, we conclude that the juvenile court acted within its discretion by accepting the therapist as an expert in attachment and bonding, early childhood trauma, and infant mental health. IV. Termination of Parental Rights ¶ 25 Father and mother also challenge the court’s termination ruling. Father asserts that the termination judgment must be reversed because he didn’t receive any visitation services and the Department interfered with his efforts to have relationships with the children. Mother contends that the court erred by determining that (1) the Department made reasonable efforts to reunify her with Dem.F. and Ki.F. when it failed to offer visits as well as family therapy; and (2) there was no less drastic alternative to termination. 
10 A. Termination Criteria and Standard of Review ¶ 26 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent hasn’t complied with an appropriate, court-approved treatment plan or the plan hasn’t been successful; (3) the parent is unfit; and (4) the parent’s conduct or condition is unlikely to change in a reasonable time. § 19-3-
604(1)(c), C.R.S. 2021; People in Interest of C.H., 166 P.3d 288, 289 (Colo. App. 2007). ¶ 27 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 15. A determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case are questions of law that we review de novo. M.A.W. v. People in Interest of A.L.W., 2020 CO 11, ¶ 31. ¶ 28 However, we won’t disturb the court’s factual findings and conclusions if they have record support. A.M., ¶ 15; People in Interest of C.A.K., 652 P.2d 603, 613 (Colo. 1982). Indeed, the 
11 credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are within the province of the juvenile court. C.A.K., 652 P.2d at 613. B. The Provision of Services 1. The Legal Framework ¶ 29 In determining parental unfitness and the likelihood that a parent’s conduct or condition will change, the court must consider whether reasonable efforts have been unable to rehabilitate the parent. § 19-3-604(2)(h); People in Interest of S.N-V., 300 P.3d 911, 915 (Colo. App. 2011). Thus, before the court may terminate parental rights under section 19-3-604(1)(c), the state must make reasonable efforts to rehabilitate parents and reunite families. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, C.R.S. 2021; People in Interest of C.Z., 2015 COA 87, ¶ 55. ¶ 30 “Reasonable efforts” means the “exercise of diligence and care” for a child who is in out-of-home placement. § 19-1-103(114). The reasonable efforts standard is satisfied when services are provided in accordance with section 19-3-208. § 19-1-103(114). Among other things, the Department must offer screening, assessments, 
12 and individual case plans; information and referrals to available public and private assistance resources; and visitation services. § 19-3-208(2)(b)(I), (III)-(IV). If funding is available, it must also provide family support services, including family counseling. § 19-
3-208(2)(d)(VII). ¶ 31 Even so, the reasonable efforts that a Department must provide are linked to the objectives of a parent’s treatment plan. People in Interest of K.B., 2016 COA 21, ¶ 16. Indeed, in determining whether reasonable efforts have been unable to rehabilitate the parent, the court must first consider whether the services provided were appropriate to support the parent’s treatment plan. Id.; see also S.N-V., 300 P.3d at 915. ¶ 32 And, significantly, the child’s health and safety are the paramount concerns in determining whether services, including visitation, are necessary and appropriate. People in Interest of A.A., 2020 COA 154, ¶ 17. In making this determination, the court may rely on the recommendations of experts, such as therapists. See People in Interest of B.C., 122 P.3d 1067, 1071 (Colo. App. 2005). But the court must make the ultimate determination whether visitation and other services are appropriate based on the child’s 
13 health and safety and cannot delegate that decision to others. Id. at 1070-71; People in Interest of D.G., 140 P.3d 299, 302 (Colo. App. 2006). 2. Father’s Ability to Contact and Visit the Children ¶ 33 The court initially approved a treatment plan that didn’t authorize face-to-face visitation for father. Rather, it required him to maintain written and telephone contact with the children as allowed by the court, the prison, the guardian ad litem, and the Department. As part of the subsequent dispositional order, the court determined that it wasn’t appropriate for father to have visits with the twins. And, in later hearings, the court found that it wasn’t appropriate for father to have visits with any of the children. ¶ 34 Although the court ultimately determined that father couldn’t visit the children, it didn’t restrict his ability to have written contact with them. Father wrote letters to each of the children. He had also submitted to the Department photographs and pictures that he had created for the children. ¶ 35 Yet, the caseworker testified that she hadn’t provided the letters or pictures to the children based on the recommendations of the older children’s therapists and a clinical social worker. Another 
14 clinical social worker similarly testified that she had determined that it wouldn’t be beneficial to the twins’ growth and development to have contact with father. ¶ 36 Nonetheless, even if we assume that the court erred by failing to approve face-to-face visits or oversee father’s ability to have written contact with the children, we discern no basis for reversal. Father doesn’t explain, and we are unable to understand, how allowing him to have visits or contact with the children through letters and pictures would have rendered him a fit parent who was able to care for the children. Father remained incarcerated in prison and wasn’t eligible for parole until nearly a year after the termination hearing. ¶ 37 Additionally, evidence supports the court’s finding that father has mental health disorders that render him unable to meet the children’s needs within a reasonable time. A psychologist who evaluated father diagnosed him as having (1) post-traumatic stress disorder; (2) bipolar disorder; (3) an unspecified anxiety disorder with dissociative features; and (4) a very severe mixed personality disorder. Father’s personality disorder is characterized by antisocial, narcissistic, borderline, and schizotypal features. The 
15 psychologist explained that the personality disorder causes father to be unable to trust anyone or show the empathy that is necessary to safely raise children. ¶ 38 Based on this evidence, we won’t disturb the termination judgment. 3. Visitation and Family Therapy Services for Mother ¶ 39 Mother was initially able to have supervised visits with Dem.F. and Ki.F. However, the Department became concerned about how Dem.F. and Ki.F. were responding to mother during visits, as well as their behavior after visits. As a result, in May 2019, mother participated in a visitation assessment. ¶ 40 The therapist who conducted the assessment determined that having visits with mother was negatively impacting the social, emotional, and physical health of Dem.F. and Ki.F. The therapist explained that Dem.F. showed a disorganized attachment to mother, which meant that he no longer relied on her in a trusting, safe capacity. Ki.F. had an avoidant attachment, which the therapist described as a complete lack of attachment to mother. For example, during that assessment, Ki.F. referred to mother as “[Dem.F.’s] mom.” 
16 ¶ 41 After mother completed the assessment, the court, without objection, approved a treatment plan that precluded mother from having visits with Dem.F. and Ki.F. until it determined otherwise. And, at subsequent hearings, the court found that it wasn’t appropriate for Dem.F. and Ki.F. to have visits with mother. By doing so, the court relieved the Department of its obligation to provide visitation services for mother. And mother doesn’t assert that the court failed to base these determinations on the health and safety of Dem.F. and Ki.F. ¶ 42 Additionally, the Department did make continuing efforts to ascertain if it was appropriate for Dem.F. and Ki.F. to have visits with mother. The Department arranged for the same therapist who had completed the initial visitation assessment to conduct a re-
evaluation in August 2020. The purpose of the re-evaluation was to again assess the children’s relationship with mother and see if any progress had been made since the initial assessment. ¶ 43 During the re-evaluation, the therapist observed that mother had made some progress as she was better able to play with the children and observe how they were responding to her. But mother continued to have difficulty recognizing the children’s nonverbal 
17 cues showing mistrust and fear. Thus, the therapist believed that mother remained unable to safely parent Dem.F. and Ki.F. ¶ 44 Mother correctly points out that the Department didn’t arrange for her to engage in family therapy. But the treatment plan didn’t contemplate mother participating in therapy with Dem.F. and Ki.F. Thus, this wasn’t a service that the Department was required to provide. ¶ 45 Moreover, the record is devoid of any indication that family therapy would have been appropriate based on the children’s health and safety. Indeed, the therapist who completed the visitation assessment explained that family therapy would only be appropriate once the children were therapeutically ready for it and mother was able to take accountability for her actions. ¶ 46 Given this record, we discern no error in the termination judgment. C. Less Drastic Alternative ¶ 47 Finally, we turn to mother’s contention that the court erred by determining that there was no less drastic alternative to termination. She argues that she had successfully completed her 
18 treatment plan and that giving her more time to participate in family therapy was a viable alternative. Again, we aren’t persuaded. 1. The Law ¶ 48 When considering termination under section 19-3-604(1)(c), the court must also consider and eliminate less drastic alternatives to termination. People in Interest of M.M., 726 P.2d 1108, 1122 (Colo. 1986). This determination is implicit in, and thus intertwined with, the statutory criteria for termination. People in Interest of L.M., 2018 COA 57M, ¶ 24. ¶ 49 A parent must be given a reasonable time to comply with an appropriate treatment plan before the court may terminate parental rights. People in Interest of D.Y., 176 P.3d 874, 876 (Colo. App. 2007). What constitutes a reasonable time is fact-specific and varies from case to case. Id. This determination may also be influenced by whether a parent’s conduct or condition is likely to change in a reasonable time. See People in Interest of J.C.R., 259 P.3d 1279, 1284 (Colo. App. 2011). ¶ 50 And, as with all termination criteria, the court must give primary consideration to the child’s physical, mental, and emotional conditions and needs. § 19-3-604(3); A.M., ¶ 20. Thus, the court 
19 may consider whether an ongoing relationship with the parent would be beneficial or detrimental to the child and the child’s need for permanency when determining whether there is a viable alternative to termination. L.M., ¶ 29. Indeed, the primary and controlling issue in termination proceedings is the determination of what will serve the child’s interests and welfare. A.M., ¶ 20. 2. The Record ¶ 51 The record reveals that mother had more than sixteen months to engage in the services required by her treatment plan. And the juvenile court recognized that mother had engaged in a variety of services and made progress in many areas. Specifically, it found that mother had completed two psychological evaluations, engaged in therapy, took recommended psychotropic medication, found and maintained employment, improved the condition of her home, complied with probation, and learned some ways to empathize with her children. ¶ 52 Despite these efforts, the court determined that mother had a significant, long-standing mental illness that rendered her unable to provide nurturing parenting for Dem.F. and Ki.F. within a reasonable time. The record supports this determination. 
20 ¶ 53 The psychologist who twice evaluated mother determined that she had an unspecified depressive disorder as well as a personality disorder with histrionic, compulsive, and turbulent traits. The psychologist explained that the personality disorder meant that mother sought the attention of others and had a tendency to be emotional in a superficial manner without much awareness of underlying needs or feelings. And she used denial, avoidance, and minimization as coping mechanisms. The psychologist also elaborated that mother struggled with being aware of and expressing her own feelings, which, in turn, limited her ability to accurately see and meet her children’s needs. In the end, the psychologist believed that mother’s personality disorder rendered her unable to meet the children’s needs. ¶ 54 The psychologist acknowledged that mother had showed some significant and positive changes, including addressing her depression, during the follow-up evaluation in September 2020. Nonetheless, the psychologist observed that mother’s personality functioning of avoiding and denying serious issues had stayed the same. Indeed, the psychologist described the personality disorder 
21 as a chronic, long-standing condition, which was unlikely to change in a reasonable time for Dem.F. and Ki.F. ¶ 55 The therapist who assessed mother’s interactions with Dem.F. and Ki.F. also believed that mother wouldn’t be able to remedy the children’s unhealthy attachment to her in a reasonable time. The therapist estimated that it would take at least a year or more to do so given the children’s extended out-of-home placement, Dem.F.’s continued disorganized attachment to mother, Ki.F.’s avoidant attachment, and mother’s continuing inability to attend to the children’s cues and recognize their mistrust in her. The therapist further explained that these attachment issues wouldn’t be improved simply by having mother have more contact with the children because continuing to expose the children to visits that led to dysregulation would only reinforce pathology that would be detrimental to their well-being. ¶ 56 The record further reveals that Dem.F. and Ki.F., who had been in multiple placements during the nearly two years that the case had been open, needed permanency. After initially being placed in a local foster home, Dem.F. and Ki.F. transitioned to the care of a kinship provider. However, the kinship provider was 
22 unable to continue caring for them and they were placed in a different foster family. When that foster family had to relocate to a different part of the state, the Department moved Dem.F. and Ki.F. to a different local foster home. But that local foster care provider wasn’t able to serve as a long-term placement and, as a result, the Department moved the children to a different foster home. ¶ 57 Ki.F. remained in that foster home, but Dem.F., who had significant struggles in the home, had been moved to a respite foster care provider. During the pendency of the termination hearing, the Department learned that Dem.F. was receiving inappropriate care in the respite home and had to move him to yet another foster care provider. ¶ 58 Finally, Dem.F. and Ki.F. were under the age of six when the Department initiated the dependency and neglect proceeding, rendering the expedited permanency planning provisions applicable. They required that the children be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2021. ¶ 59 For these reasons, we won’t disturb the juvenile court’s determination that extending the time for mother to continue 
23 working on the treatment plan was not a less drastic alternative to termination. V. Conclusion ¶ 60 The judgments are affirmed. JUDGE LIPINSKY and JUDGE GOMEZ concur.